| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>Peter H. Zaret dba Peter Zaret & Sons Violins, Inc.,<br><br>         Plaintiff,<br>  -against-<br><br>David Bonsey, D. Bonsey, Inc. aka New York Violin Consulting Inc., Florian Leonhard, Florian Leonhard Fine Violins, Inc., Peter Horner, Brompton's Auctioneers Limited, Charles Beare OBE, Beare Violins Limited, Joe W. Robson,<br><br>         Defendants. | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: _9/28/2023_<br><br><br>22 Civ. 7109 (AT)<br><br>**ORDER** |

ANALISA TORRES, District Judge:

  Plaintiff, Peter H. Zaret d/b/a Peter Zaret & Sons Violins, Inc., brings this product disparagement action against Defendants David Bonsey, D. Bonsey, Inc. a/k/a New York Violin Consulting Inc., Florian Leonhard, Florian Leonhard Fine Violins, Inc., Peter Horner, Brompton's Auctioneers Limited, Charles Beare OBE, Beare Violins Limited, and Joe W. Robson, alleging that Defendants wrongfully disputed Zaret's claim that a violin in his possession was produced by renowned Italian violin maker Antonio Stradivari. Second Am. Compl. ¶¶ 93–94, ECF No. 60 (the "SAC"). Each Defendant moves to dismiss the SAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Brompton's, Beare & Horner Mot., ECF No. 100; Leonhard Mot., ECF No. 102; Robson Mot., ECF No. 104; Bonsey Mot., ECF No. 106. For the reasons stated below, Defendants' motions are GRANTED.

  Plaintiff also seeks leave to file a proposed third amended complaint (the "PTAC"), ECF No. 91, pursuant to Federal Rule of Civil Procedure 15(a). *See* Pl. Mot. Amend, ECF No. 82; Pl. Reply, ECF No. 91. The PTAC differs from the SAC in two respects: the PTAC provides additional facts in support of Plaintiff's product disparagement claim, and includes a new cause

of action against Defendant Charles Beare for tortious interference with prospective economic relations.  For the reasons stated below, Plaintiff's motion to amend the complaint is DENIED.

## BACKGROUND[1]

This matter concerns the identity and value of an antique violin that Zaret, an Ohio resident and former concertmaster, purchased for $20,000 at a 1998 auction.  SAC ¶ 22.  The violin was not advertised as a Stradivarius, the work of eighteenth-century Italian violin maker Antonio Stradivari, but as "an interesting violin" with papers "suggesting it was produced in [Stradivari's] workshop."  *Id.*  Stradivarius violins "routinely command very high prices" and have been sold for as much as $16 million.  *Id.*  In 2015, in an effort to sell the violin to "one of the great symphony orchestras or performing virtuosos," Zaret and his acquaintance Terrence J. Kavalec sought to authenticate the violin as a genuine Stradivarius.  *Id.* ¶¶ 22–23.

Defendants are individuals and corporations domiciled in New York and the United Kingdom and involved in the appraisal, auction, and study of rare and antique string instruments. *Id.* ¶¶ 8–16.  Zaret claims that Defendants publicly disparaged the violin, "preclud[ing] the possibility that the instrument could be deemed [an] authentic Strad[ivarius]," *id.* ¶ 103, and thereby handing down "a death sentence" to the marketability of the instrument, *id.* ¶ 88.  The SAC details two sets of disparaging statements made by Defendants.

The first set centers around Zaret's efforts to sell the violin through private transactions and forms the basis of Zaret's claim against Leonhard, Bonsey, and Robson.[2]  *See id.* ¶¶ 25–70.  In October 2015, Kavalec contacted David Bonsey, a violin maker, appraiser, and President of

---

[1] The following facts are taken from the complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim."  *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 398 (2d Cir. 2015).
[2] Plaintiff's claim against entities D. Bonsey, Inc. a/k/a New York Violin Consulting Inc. and Florian Leonhard Fine Violins, Inc. are also based on this first set of allegedly disparaging statements.

2

the American Federation of Violin and Bow Makers ("AFVBM"), about authenticating the violin. *Id.* ¶¶ 27–28. After reviewing information about the violin, Bonsey stated that aspects of the violin were similar to a Stradivarius he sold in 2006 and suggested that Kavalec meet Florian Leonhard, "a violin maker, dealer, restorer[,] and expert." *Id.* ¶¶ 10, 30. In November 2015, Leonhard met with Kavalec and examined the violin, concluding that it was not a Stradivarius, but instead a copy of an 1890s German "Ruggieri" violin. *Id.* ¶¶ 30–31. This assessment ended Bonsey's interest in Zaret's violin. *Id.* ¶ 32.

Undeterred, Zaret and Kavalec sought the opinion of Joseph W. Robson, "an author and varnish expert." *Id.* ¶¶ 16, 40–41. At a November 2018 lecture, Robson opined that cochineal varnish, a reddish varnish or coating derived from insects, was "the *sine qua non* of Casa Stradivarius." *Id.* ¶ 40. The following day, Robson inspected Zaret's violin and stated that it "was indeed created with [c]ochineal [v]arnish." *Id.* ¶ 41.

However, in November 2019, Robson expressed doubts about the violin to the editor of Strad Magazine, a publication about string instruments. *Id.* ¶ 41 n.6. In February 2020, Robson requested that Zaret cease to use Robson's "name as verification of any sort" of the violin's status as a Stradivarius. *Id.* ¶ 57. In February 2022, Robson wrote on Maestronet, a website read by "at least 75% of the people in the [string instrument] trade," *id.* ¶ 60, that each person that had examined Zaret's violin "dismissed the 'fact' that this was a Stradivari instrument," *id.* ¶ 59. Zaret claims that Robson's shift was instigated by David Bonsey, whom Plaintiff alleges Robson knew from an AFVBM event. *Id.* ¶¶ 58, 100.

The second set of statements relates to Zaret's efforts to consign the violin to an auction house and grounds his claim against Horner, Beare, and Brompton's Auctioneers.[3] During the

---

[3] Plaintiff's claim against Beare Violins Limited is also based on this second set of allegedly disparaging statements.

summer of 2021, Kavalec began corresponding with Peter Horner, "a citizen of the United Kingdom and a founding member of Brompton's Auctioneers." *Id.* ¶¶ 12, 73. Horner initially showed interest in Zaret's violin and arranged to meet with Kavalec in New York on January 22, 2022. *Id.* ¶ 75. In that meeting, Horner exclaimed that the violin's "scroll is perfect" but "that [the] certification of Charles Beare would be a necessary precondition for a Brompton's auction." *Id.* ¶ 76. Beare is a "British violin expert-authenticator, craftsman[,] and [d]ealer" whose family has studied and authenticated violins for several generations. *Id.* ¶ 14. By email dated January 25, 2022, Horner requested that Kavalec send pictures of the violin to Beare. *Id.* ¶ 78. A day later, on January 26, 2022, Horner informed Kavalec that Beare had concluded from the images that the violin was most likely the work of "one of the fine French [violin] makers," not Stradivari. *Id.* ¶ 79. Zaret alleges that, by making this judgment after only reviewing two-dimensional images, Beare "depart[ed] from the careful inspection protocols required by professional associations." *Id.* ¶ 85.

As a result of these two sets of statements, Zaret claims that his violin "cannot be lawfully represented as a genuine Stradivarius without disclosure of the adverse opinion[s]" of Bonsey, Leonhard, Beare, and Horner. *Id.* ¶¶ 69–87.

Zaret states that two attempted sales of the violin fell through as a result of the alleged product disparagement. First, in 2017, a sale in the "$9- to $10 million range" to "Ezio Lappano, a violinist representing an undisclosed principal," fell through because Lappano "conditioned [the sale] upon a certification of authenticity from Charles Beare." *Id.* ¶ 34. Subsequently, from October 2021 to January 2022, Kavalec, acting as Zaret's agent, negotiated the violin's sale with Professor Odin Rathnam of Cleveland State University, who was representing Nikolaj

Szeps-Znaider of the Orchestre National de Lyon. *Id.* ¶ 97. However, negotiations ceased when Kavalec disclosed Beare's judgment that the violin was likely not a Stradivarius. *Id.*

On August 19, 2022, Plaintiff filed the instant action. Compl., ECF No. 1. On October 23, 2022, Plaintiff amended his complaint, ECF No. 52, and, on November 2, 2022, amended again, ECF No. 62. On November 25, 2022, Plaintiff moved the Court for leave to file the PTAC. ECF No. 82. On December 21, 2022, Defendants filed their motions to dismiss the SAC. ECF Nos. 100, 102, 104, 106.

## DISCUSSION

I. <u>Defendants' Motions to Dismiss the Second Amended Complaint</u>

A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. The Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). That tenet, however, does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

B. Analysis

Defendants move to dismiss Plaintiff's sole cause of action. *See* ECF No. 101 at 8–18; ECF No. 103 at 6–15; ECF No. 105 at 8–16; ECF No. 108 at 9–18. Plaintiff asserts a claim of product disparagement under New York law, which permits a plaintiff "to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property." *Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016) (citation omitted). To state a claim, Plaintiff "must adequately plead (1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) special damages." *Id.* (cleaned up); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235, 239 (S.D.N.Y. 1999), *aff'd*, 314 F.3d 48 (2d Cir. 2002); *see also Drug Rsch. Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 440 (1960). Zaret has not pleaded special damages and, therefore, his claim cannot survive.[4]

Under New York law, special damages are defined as "losses having pecuniary or economic value," articulated "with sufficient particularity to identify actual losses." *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992). Whether a plaintiff has suffered special damages "goes to the cause of an action itself and not merely to the recovery." *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 410 (S.D.N.Y. 2021) (cleaned up). Therefore, courts "strictly" apply the special damages requirement and "grant[] motions to dismiss for failure to allege special damages with the requisite specificity." *Id.* (citations omitted).

To plead special damages, Plaintiff must name "the individuals who ceased to be customers" and itemize "the exact damages" incurred. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002) (cleaned up). Plaintiff cannot plead a round

---

[4] Because Plaintiff has failed to plead an essential element of the cause of action, the Court shall not reach the other substantive and procedural issues discussed in Defendants' motions to dismiss.

number untethered to an offer or precise sale price, *Drug Rsch. Corp.*, 7 N.Y.2d at 441, as damages must be tied to an actual lost sale, *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641–43 (2d Cir. 2015) (dismissing suit in which special damages were pleaded based on the value of comparable products and not the allegedly disparaged product); *see Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 278 (S.D.N.Y. 2003). Finally, to be recoverable, "special damages must be the 'natural and immediate consequence of the disparaging statements.'" *Kirby*, 784 F. Supp. at 1116 (quoting *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989)); *see Cambridge Assocs. v. Inland Vale Farm Co.*, 116 A.D.2d 684, 686 (N.Y. App. Div. 1986) (requiring that special damages be "related causally to the alleged tortious acts").

The SAC fails to allege special damages with regard to Zaret's two attempted sales of the violin. First, the 2017 attempted sale to an undisclosed principal represented by Ezio Lappano, SAC ¶ 34, lacks the particularity required by New York law. Zaret's claim that the contemplated sale was in the "$9- to $10 million range" is an approximation of damages "insufficient as a matter of law." *Gucci Am., Inc.* 277 F. Supp. 2d at 278; *see Bilinski*, 632 F. App'x at 641. The SAC's allegations concerning Zaret's second sale attempt, Kavalec's negotiations with Znaider from October 2021 to January 2022, fare no better. The SAC does not allege a price, merely stating that "Znaider had funding and wished to confidentially negotiate a purchase." SAC ¶ 97. Finally, the SAC does not attempt to tether Zaret's losses to these sales, seeking instead $8.95 million based on Zaret's own estimate of the violin's fair market value. SAC ¶¶ 111–15; *see Bilinski*, 632 F. App'x at 641.

Plaintiff then argues that special damages may be pleaded under the relaxed "loss of market" theory. *See* ECF No. 110 at 10–11; ECF No. 113 at 19–20; ECF No. 114 at 21; ECF No.

7

115 at 25. Under that theory, Zaret argues that special damages may be calculated based on the violin's appraised value, not the precise amount a customer would have paid but for the disparagement.[5] *See, e.g.*, ECF No. 114 at 18. In the instant case, Plaintiff claims that (1) "there is a ready market for genuine Stradivariuses"; (2) "the accumulated disabilities arising from the various disparagements at suit render[ed] any propitious sale [of Zaret's violin] virtually impossible"; and (3) "the identities of those who would seek after the [violin] are unknown." ECF No. 113 at 19; *see* ECF No. 110 at 11–12; ECF No. 115 at 25.

According to the Restatement, when a plaintiff can demonstrate "with reasonable certainty" that a "[w]idely disseminated" injurious falsehood caused "serious and genuine pecuniary loss by affecting the conduct of a number of persons whom the plaintiff is unable to identify and so depriving him of a market that he would otherwise have found[,] . . . the rule requiring the identification of specific purchasers is relaxed and recovery is permitted for the loss of the market." Restatement (Second) of Torts § 633 cmt. h (1977). Plaintiff cites a single case from the Southern District of New York, *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 155–56 (S.D.N.Y. 1983), in which special damages were permitted to be pleaded based on a loss of market. The Second Circuit has remarked, however, that "the New York Court of Appeals has yet to adopt this theory of special damages." *See Bilinski*, 632 F. App'x at 642.[6]

---

[5] Zaret cites *Sette-Hughes v. Sprauve*, 663 F. App'x 10, 11 (2d Cir. 2016), in arguing that special damages may be calculated based on the violin's appraised value. Pl. Opp'n Mem., ECF No. 110 at 9–10. This argument is unavailing as *Sette-Hughes* does not concern the requirement to plead special damages.

[6] When a New York trial court, citing *Atlas*, recognized this theory, it was reversed on appeal by the Appellate Division, First Department. *Prince v. Fox Television Stations, Inc.*, 33 Misc.3d 1225(A), 2011 WL 5901926, at *9 (N.Y. Sup. Ct. Nov. 23, 2011), *aff'd as modified*, 93 A.D.3d 614 (N.Y. App. Div. 2012)) (alterations omitted); *see also Bilinski*, 632 F. App'x at 642 n.2.

The SAC fails to satisfy the relaxed standard set forth in *Atlas*.[7] In *Atlas*, a case concerning the alleged disparagement of plaintiff's exercise product sold exclusively by mail-order, it was "impossible to identify those who did not order the plaintiff's product," as potential customers "would simply have failed to order [as a result of the alleged disparagement], thus leaving no record of their identity." *Atlas*, 570 F. Supp. at 156. In contrast to *Atlas*'s exclusively mail-order enterprise, Zaret can readily identify the market for Stradivariuses. As described in the SAC, given the nature of selling rare, antique instruments, Zaret's efforts to sell the violin were directed toward known buyers and in familiar marketplaces. *See* SAC ¶¶ 20, 22, 34, 97, 99. Because such customers are not "impossible to identify," *Bilinski*, 632 F. App'x at 642, the SAC fails to state a claim even under the loss-of-market theory.

Because Plaintiff fails to adequately plead special damages, an essential element of product disparagement, Defendants' motions to dismiss the SAC are GRANTED.

II. <u>Plaintiff's Motion for Leave to Amend the SAC</u>

Plaintiff moves to file the PTAC. *See* Pl. Mot. Amend. Zaret first seeks to plead additional facts in support of his product disparagement claim. *Id.* at 1–2. Next, the PTAC includes a new cause of action against Charles Beare for tortious interference with prospective economic relations. PTAC ¶¶ 112–21.

A. Legal Standard

Although Federal Rule of Civil Procedure 15(a) requires that the Court "freely grant leave [to amend] when justice so requires," the Court may deny an amendment if, among other reasons, it would be "futile," as when "the proposed new pleading fails to state a claim on which

---

[7] At best, *Atlas* represents a "narrow exception," cabined by the facts of the case. *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 406 (E.D.N.Y. 2004); *see also Fashion Boutique of Short Hills, Inc.*, 75 F. Supp. 2d at 240; *Bilinski*, 632 F. App'x at 642 (noting theory's requirement that potential customers be "impossible to identify").

relief can be granted." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962). Determining whether an amended complaint is futile, therefore, requires the same analysis as that "governing the adequacy of a filed pleading." *Anderson News*, 680 F.3d at 185; *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

Determining the sufficiency of a pleading is different from deciding the merits of its allegations. *See Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). As stated above, a complaint is sufficient if it states a "claim of relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

B. Analysis

1. Allegations in Support of Plaintiff's Product Disparagement Claim

Plaintiff seeks to amend his complaint to provide further support for his product disparagement claim. *See* Pl. Mot. Amend at 1–2; PTAC ¶ 54. The PTAC fails to remedy Plaintiff's failure to plead special damages, an essential element of product disparagement. *See supra* § I.C; PTAC ¶¶ 106–10 (relying on same special-damages pleading). Accordingly, Plaintiff's motion with regard to these amendments is DENIED.

2. Plaintiff's Tortious Interference with Prospective Economic Relations Claim

Plaintiff's PTAC includes a new cause of action, tortious interreference with prospective economic relations, which Plaintiff seeks to bring against Beare. PTAC ¶¶ 112–21. Plaintiff brings this claim with regard to the potential consignment of the violin to Brompton's Auctioneers, alleging that Beare tortiously interfered with Plaintiff's efforts to negotiate the violin's consignment with Peter Horner, one of Brompton's founding members. *See* Pl. Reply at

13, ECF No. 90.  Because Plaintiff fails to "state a claim on which relief can be granted," permitting Plaintiff to amend the complaint would be "futile."  *Anderson News*, 680 F.3d at 185.

To state a claim for tortious interference with prospective economic relations,[8]

> a plaintiff in New York must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.

*Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003), *certified question answered*, 3 N.Y.3d 182 (2004).

Zaret fails to adequately plead the third element of tortious interference with prospective economic relations: that Beare "acted solely out of malice, or used dishonest, unfair, or improper means."[9]  *Id.* at 17.  This "requirement makes alleging and proving a tortious interference claim with business relations 'more demanding' than proving a tortious interference with contract claim."  *Catskill Dev., LLC v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191(1980)).  Where no contract exists, "plaintiff must show more culpable conduct on the part of the defendant."  *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 87 N.Y.2d 614, 621 (1996).

"The New York Court of Appeals has explained that, as a general rule, a defendant's conduct must amount to a crime or an independent tort in order to amount to tortious interference with a prospective economic advantage."  *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58,

---

[8] Various terms are used for this cause of action, such as tortious interference with prospective economic advantage, tortious interference with business relations, and tortious interference with prospective contractual relations.  Courts use these terms interchangeably to describe the same tort (with the same elements).  Critically, this tort differs from the tort of tortious interference with contractual relations as the alleged interference does not pertain to any preexisting contractual relationships.

[9] The terms "wrongful means" and "improper means" are used interchangeably.  Because Plaintiff fails to adequately plead this element, the Court need not reach the other elements of the cause of action.

59–60 (2d Cir. 2009) (cleaned up).  A defendant who has not committed a crime or independent tort or acted solely out of malice may still be liable "if he has employed 'wrongful means.'" *Id.* "Wrongful means" include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and 'extreme and unfair' economic pressure." *NBT Bancorp Inc.*, 87 N.Y.2d at 621 (citation omitted).  "Mere persuasion directed at interfering with a prospective contract is insufficient . . . [and] mere suspicions are inadequate to support a claim for tortious interference with business relations." *Boehner v. Heise*, 734 F. Supp. 2d 389, 405 (S.D.N.Y. 2010) (quotation marks and citation omitted).

  The PTAC does not allege that Beare committed a crime.  Nor does it state that Beare committed any independent tort other than product disparagement, which the Court has already dismissed.  *See supra* § I.  Zaret does not claim that Beare employed physical violence, civil or criminal prosecution, or undue economic pressure. *See NBT Bancorp Inc.*, 87 N.Y.2d at 621; *see generally* PTAC.  Likewise, the facts as alleged do not support a finding that Beare "acted solely out of malice." *Friedman*, 321 F. App'x at 59.

  Finally, the PTAC's conclusory allegations sounding in fraud or conspiracy fail to rise above "mere suspicions." *Boehner*, 734 F. Supp. 2d at 405.  The PTAC, therefore, lacks sufficient facts showing that Beare employed "wrongful means," thereby entitling Zaret to relief. *See Twombly*, 550 U.S. at 555–57.  For example, Zaret alleges, without offering facts to support his claim, that Beare did not undertake an in-depth examination, solely reviewing two-dimensional images, in order to "kill the deal" between Zaret and Horner and gain control over the instrument, *id.* ¶¶ 117, 80, apparently as part of a larger scheme to "denigrate and undervalue instruments in an effort to [later] buy them," *id.* ¶ 90.  The PTAC is devoid of facts that would permit the Court to conclude that Beare's assessment of the violin was motivated by a desire to

"kill the deal" or gain control over the violin. Moreover, the PTAC does not allege that Beare had any interest in buying Zaret's instrument. Similarly, Zaret asserts a broad set of sensational allegations without providing a plausible connection between them and the alleged interference.[10] Lastly, Plaintiff's claim that Beare departed from "careful inspection protocols," *id.* ¶ 80, is vague and fails to demonstrate that Beare's approach was in fact a departure from accepted practices, much less one that must be deemed "wrongful" and amounting to tortious interference. Therefore, even drawing all reasonable inferences in favor of Zaret, the PTAC fails to adequately plead that Beare used wrongful means to tortiously interfere with Plaintiff's prospective economic relations.

For the foregoing reasons, Plaintiff's motion to leave to amend the complaint is DENIED.

## CONCLUSION

Defendants' motions to dismiss the SAC are GRANTED. Plaintiff's motion for leave to amend the complaint is DENIED. Plaintiff, should he seek to continue prosecuting the instant case, shall file a motion seeking leave to amend the complaint by **October 31, 2023**. The Clerk of Court is directed to terminate the motions at ECF Nos. 82, 89, 98,[11] 100, 102, 104, 106, 107, 108.

---

[10] Such allegations include those about Beare's 1997 involvement in a debate over the authenticity of a possible Stradivarius, *id.* ¶ 59, his alleged refusal to authenticate a Guarneri del Gesu violin, *id.* ¶ 24, the Beare family's longstanding involvement in the authentication trade, *id.* ¶ 25 n.3, the "part gentleman's club, part Mafia cartel" nature of the antique string instrument industry, *id.* ¶ 20, and that "any [StradMag] article suggesting the discovery of an 'unpublished' Strad must have Charles Beare's imprimatur," *id.* ¶ 47.

[11] The Court's grant of Defendants' motions to dismiss moots their motion to strike certain allegations from the SAC, ECF No. 98. Should Plaintiff replead allegations that Defendants contend violate Federal Rule of Civil Procedure 12(f), they may write the Court seeking leave to file a motion to strike such allegations.

SO ORDERED.

Dated: September 28, 2023
       New York, New York

_____
ANALISA TORRES
United States District Judge